**FIRST RAILROAD COMMUNITY FEDERAL CREDIT UNION, a federal credit union, Plaintiff,**

v.

**COLUMBIA COUNTY BANK, a Florida banking corporation, Defendant.**

No. 92–1025–Civ–J–20.

United States District Court, M.D. Florida, Jacksonville Division.

April 15, 1994.

James H. Post, Douglas D. Chunn and David Rodney Brown, Smith, Hulsey & Busey, Jacksonville, FL, for First R.R. Community Federal Credit Union, a federal credit union.

Dorry Ann Bragg, Williams, McGuire & Bragg, Orlando, FL, for Cumis Ins. Soc., Inc., a Wisconsin Corp.

William O. Birchfield and Stephen H. Durant, Martin, Ade, Birchfield & Mickler, P.A., Jacksonville, FL, for Clark Peat Crapps, Crapps Motor Co., Inc., a Florida Corp., and Crapps Chevrolet–GEO, Inc.

S. Austin Peele, Darby, Peele, Bowdoin & Payne, Lake City, FL, for ABSS Automotive, Inc.

South Financial Corp., Thomas F. Murphy, Jr., Pres., pro se.

Andrew M. Brumby, Michael Lee Gore, Shutts & Bowen, Orlando, FL, and Martin S. Page, Lake City, FL, for Columbia County Bank, a Florida banking Corp.

## ORDER

SCHLESINGER, District Judge.

Before the Court are Plaintiff First Railroad Community Federal Credit Union's ("First Railroad's") Motion for Summary Judgment (Doc. No. 115, filed February 11, 1994) and Defendant Columbia County Bank's Motion for Partial Summary Judgment (Doc. No. 117, filed February 15, 1994). Plaintiff's Memorandum of Law in Opposition to Columbia County Bank's Motion for Partial Summary Judgment (Doc. No. 127) was filed February 25, 1994, and Defendant Columbia County Bank's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 131) was filed March 8, 1994.

This action arises out of an alleged check-kiting scheme. Clark P. Crapps a/k/a Clark Peat Crapps was president of Crapps Chevrolet–GEO, Inc. f/k/a Crapps Chevrolet–Mazda–GEO, Inc., Crapps Motor Company, Inc. ("CMC") and Clark P. Crapps Company, Inc., d/b/a Crapps Honda Jeep Eagle (collectively, the "Crapps Dealerships"). The Crapps Dealerships established bank deposit and checking accounts with Columbia County Bank.

Columbia allowed immediate credit on deposits made in these accounts without any hold being placed thereon pending collection. That is, Columbia allowed the Crapps Dealerships immediate access to the funds without waiting for the deposited items to clear. From the accounts in which these deposits were made, Mr. Crapps would obtain cashier's checks and/or use those funds for deposit to other accounts at either Columbia or other financial institutions.

Checks drawn upon the accounts maintained by the Crapps Dealerships in other financial institutions were deposited into the CMC account at Columbia although insufficient funds were available in the other institutions to satisfy the deposited checks. The deposited checks were "covered" by depositing checks drawn on the CMC account at Columbia into the accounts maintained in the other financial institutions. By such activity, the insufficiency of the funds available to cover the checks deposited into the CMC account at Columbia were hidden.

The alleged check-kiting scheme collapsed in early September 1992. The transactions giving rise to this action stem from the alleged check-kiting scheme's collapse. On September 5, 1992, and September 8, 1992, several deposits were made into the CMC account at Columbia. Included in these deposits were checks drawn upon a CMC account with First Railroad. Columbia credited the CMC account with the deposits without waiting for the deposited checks to clear. This turned out to be unwise because CMC then obtained two cashier's checks from Columbia, each for $300,000, in return for checks in like amount drawn upon the CMC account at Columbia. Both of these cashier's checks were deposited into CMC's First Railroad account on September 8, 1992. On or about September 10, 1992, Columbia became aware of the alleged check-kiting scheme. When First Railroad submitted the cashier's checks to Columbia on September 17, 1992, payment was refused. First Railroad brought this suit seeking payment for the cashier's checks.

Both parties agree that the Florida Supreme Court case of *Warren Finance, Inc., v. Barnett Bank of Jacksonville,* 552 So.2d 194 (Fla.1989), governs this action. It is their interpretation of this case which differs. First Railroad argues that under Florida law the only reasons a bank can legally refuse payment of a cashier's check upon presentment are (i) if the cashier's check is not presented by a legitimate holder, i.e., the check was presented by a thief or one who simply found a lost check, or (ii) if the cashier's check was materially altered. Columbia argues that it may assert its real and personal defenses in order to refuse payment on the cashier's checks. Columbia argues that its

defenses of fraud and failure of consideration allow it to refuse to honor the cashier's checks presented by First Railroad.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, *Key West Harbor v. City of Key West*, 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256, 257 (11th Cir.1989). The nonmovant need not be given the benefit of every inference, but only of every "reasonable" inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir.1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgement motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

In a diversity action, a federal court is required to apply the substantive law of the forum state as pronounced by the highest court of that state. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Warren Finance*, the Florida Supreme Court discussed the two theories adopted by courts regarding cashier's checks—the cash equivalency theory and the note theory.

The Florida Supreme Court characterized those cases barring a bank from ever refus-

ing payment on an issued cashier's check as applying the cash equivalency theory. The cash equivalency theory focuses on the cash-like attributes of cashier's checks. *See Warren Finance, Inc.*, 552 So.2d at 196.

The Florida Supreme Court characterized those courts which treat a cashier's check as an ordinary note under the Uniform Commercial Code as utilizing the note theory. *See Id.* at 197–98. The courts that utilize the note theory hold that, because a cashier's check is effective as a note, the provisions of the Uniform Commercial Code ("U.C.C.") dealing with ordinary negotiable instruments apply. Under the note theory, if a payee or endorsee of a cashier's check is a holder in due course,[1] courts apply U.C.C. § 3–305 and limit the bank's defenses to those defenses real to the bank. *See Id.* at 198 (citations omitted). "On the other hand, if the payee or endorsee is determined to be a nonholder in due course, courts adopting the note approach apply section 3–306 and permit the bank to assert its real and personal defenses." *Id.*

The Florida Supreme Court rejected both of these theories and, instead, took the middle ground by adopting a "hybrid theory." Although Columbia agrees that the Florida Supreme Court chose a middle ground between the cash equivalency theory and the note theory, *see* Memorandum of Law in Support of Columbia's Motion for Partial Summary Judgment (Doc. No. 118) at 5–6, Columbia is still trying to argue the note theory.

Columbia's primary contentions justifying its refusal to pay First Railroad consists of Crapps' and CMC's fraud on Columbia in depositing worthless checks into the Colum-

bia CMC account. Additionally, Columbia contends that CMC failed to give Columbia adequate consideration for the cashier's checks. *See* Memorandum of Law in Support of Columbia's Motion for Partial Summary Judgment at 2–3. Columbia asserts that "CMC's fraud in the procurement of the cashier's checks and the lack of consideration supporting their issuance" supports Columbia's refusal to honor the cashier's checks. *Id.* at 6.

Columbia argues that it can assert its real and personal defenses. Columbia argues that if First Railroad is a holder in due course, then the only defenses it may assert are the so called "real defenses." "Real defenses" are "those which go to the existence of the instrument as a binding obligation, while 'personal defenses' are not available against holders in due course but are available against others." 6 Fla.Jur.2d *Bills and Notes* § 447 (1978). The "real defenses" are codified in *Fla.Stat.* § 673.305(2) (1991). The "personal defenses," those which are not available against a holder in due course, are set forth in *Fla.Stat.* § 673.306 (1991).

Columbia admits that its defenses of failure of consideration and common fraud do not fall into the category of "real defenses."[2] Columbia argues, however, that its defenses are recognized as "personal defenses" under Florida law. Columbia then asserts that, for summary judgment purposes, First Railroad can overcome these personal defenses in one of two ways: "(i) by demonstrating that the asserted defenses are not supported by the undisputed facts in this case; or (ii) by establishing that First Railroad is a holder in due course with respect to the Cashier's Checks and, therefore, it took the checks free of

---

1. U.C.C. § 3–302 (1987) provides as follows:
   Holder in due course.
   (1) A holder in due course is a holder who takes the instrument:
   (a) for value; and
   (b) in good faith; and
   (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
   (2) A payee may be a holder in due course.
   (3) A holder does not become a holder in due course of an instrument:
   (a) by purchase of it at judicial sale or by taking it under legal process; or

(b) by acquiring it in taking over an estate; or
   (c) by purchasing it as part of a bulk transaction not in the regular course of business of the transferor.
   (4) A purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased.

2. The real defenses are infancy, duress, fraud in the factum, and discharge in an insolvency proceeding.

Columbia's 'personal defenses.' " Columbia's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment at 11–12.

▮ Columbia is arguing that one of the issues that needs to be decided is whether First Railroad is a holder in due course. However, the Florida Supreme Court explicitly stated that a bank's duty to pay its cashier's checks when presented for payment should not depend on whether the presenter is a holder in due course. In rejecting the note theory, the Florida Supreme Court stated that,

> when a payee or endorsee presents a cashier's check for payment, **its right to payment should not depend on its status as a holder or nonholder in due course.** This is in accord with the purpose of a cashier's check, that is, to avoid the litigation costs entailed in obtaining payment. If a payee or endorsee's right to payment upon presentment is dependent upon whether it is a holder or nonholder in due course, there would be no reason to distinguish cashier's checks form ordinary negotiable instruments. Because the payee or endorsee has the burden of establishing its holder in due course status under section 3–307, any approach that permits a bank to refuse payment on its cashier's check based on the status of the holder may force the payee or endorsee to incur litigation to obtain payment on the check. This would undermine the very foundation of a cashier's check and disregard the special characteristics attributable to cashier's checks.

*Id.* at 199 (emphasis added). The Florida Supreme Court went on to "reiterate that a bank's duty to pay its cashier's check when presented for payment should not depend upon whether the presenter of the check is a holder in due course." *Id.* at 200.

If this Court chose Columbia's approach, then it would have to directly controvert what the Florida Supreme Court stated in *Warren Finance*. *Warren Finance* chose the middle ground between the cash equiva-

lency theory and the note theory. This middle ground is simply that a bank can only check to see if the presenter of a cashier's check is a legitimate holder. The Florida Supreme Court's hybrid theory focuses upon "the purpose and use of a cashier's check ... to determine the respective rights and liabilities of parties to that check." *Id.* at 200.

"The purpose of a cashier's check is to act as a cash substitute in dealings between parties. Parties using cashier's checks in place of ordinary checks or instruments do so because cashier's checks do not carry the risk of litigation costs or insolvency." *Warren Finance*, 552 So.2d at 195 (citations omitted). "A cashier's check, unlike an ordinary check, stands on its own foundation as an independent, unconditional, and primary obligation of the bank." *Id.* at 196 (citing *Pennsylvania v. Curtiss National Bank*, 427 F.2d 395 (5th Cir.1970);[3] *Riverside Bank v. Maxa*, 45 So.2d 678 (Fla.1950); *Crosby v. Lewis*, 523 So.2d 1154 (Fla. 5th Dist.Ct.App.1988)). "People accept a cashier's check as a substitute for cash because the bank stands behind the check, rather than an individual." *Id.* (citation omitted). "When used in place of a personal check or other negotiable instrument, the parties' expectation is that **the cashier's check will remove doubt as to whether the instrument will be returned to the holder unpaid due to insufficient funds** in the account, a stop payment order, or insolvency." *Id.* (emphasis added).

The Court finds that the "hybrid approach" adopted by the Florida Supreme Court is that the "only inquiry a bank may make upon presentment of a cashier's check is whether or not the payee or endorsee is in fact a legitimate holder, i.e., whether the cashier's check is being presented by a thief or one who simply found a lost check, or whether the check has been materially altered." *Id.* at 201 (citing *Parker v. Dudley*, 527 So.2d 240 (Fla. 5th Dist.Ct.App.)), *review denied*, 536 So.2d 243 (Fla.1988); *see e.g., Earle v. Southeast Bank, N.A.*, 590 So.2d 1072, 1074 (Fla. 2d Dist.Ct.App.1991) (the bank was obligated to make payment on cashier's checks because "the only inquiry a bank can make upon presentment of a cash-

---

3. All cases decided by the former Fifth Circuit Court of Appeals prior to the close of business on September 30, 1981, are binding on the Eleventh Circuit and on all district courts within the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

ier's check is whether the payee or endorsee is in fact a legitimate holder").

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1) First Railroad's Motion for Summary Judgment (Doc. No. 115) is **GRANTED,**

(2) Defendant Columbia County· Bank's Motion for Partial Summary Judgment (Doc. No. 117) is **DENIED,**

(3) The Clerk is directed to enter Judgment in favor of First Railroad against Columbia County Bank in the sum of $600,000 plus interest,

(4) Barnett Bank of North Central Florida's Motion to Rescind and Stay Order of Magistrate Judge (Doc. No. 123, filed February 15, 1994) is **MOOT,**

(5) Citizens Bank of Live Oak n/k/a CNB National Bank's Motion to Stay Magistrate's Order (Doc. No. 119, filed February 15, 1994) is **MOOT,**

(6) CNB's Supplemental Objections to Magistrate's Order, Motion to Stay Magistrate's Order and Supporting Memorandum of Law (Doc. No. 125, filed February 11, 1994) is **MOOT,** and

(7) The Clerk is directed to close the file.

**DONE AND ENTERED.**